**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF GEORGIA
ATLANTA DIVISION**

| | | |
|---|---|---|
| UNITED STATES LIABILITY | : | |
| INSURANCE COMPANY and | : | |
| MOUNT VERNON FIRE | : | |
| INSURANCE COMPANY, | : | |
| | : | CIVIL ACTION NO. |
| Plaintiffs, | : | 1:07-CV-1476-JOF |
| | : | |
| v. | : | |
| | : | |
| PC GENERAL AGENCY, INC., | : | |
| | : | |
| Defendant. | : | |

**OPINION AND ORDER**

The instant matter is before the court on Defendant PC General Agency, Inc.'s ("PCG") Motion for Summary Judgment [39] and Motion to Withdraw Philip Botwinik as Attorney [48].

**I.  Background**

**A.  Facts**

The instant dispute is about an insurance agent's failure to remit insurance premiums to two of its principal insurance companies and who may be held liable for this failure. The court draws the following undisputed facts largely from the relevant agency and

management contracts, the documentation filed in non-party Kenneth Tobey, Inc.'s ("KIT") bankruptcy proceeding, and the Defendant's Fed. R. Civ. P. 30(b)(6) deposition.

Plaintiffs United States Liability Insurance Company ("United") and Mount Vernon Fire Insurance Company ("Mt. Vernon") are insurance companies specializing in low premium, low hazard insurance products. On April 15, 2004, United and Mt. Vernon each entered into identical insurance agreements, hereafter known as the "Agency Agreements," with non-party KIT. (Comp. Ex. 1, 2). Pursuant to the Agency Agreements, Plaintiffs granted KIT the authority to sell their respective insurance products and the right to receive a commission based upon the amount of premiums collected. (*Id.* §§ 1.2, 4.1). In exchange, KIT accepted responsibility for collecting premiums and paying Plaintiffs all premiums on written policies due. (*Id.* § 4.2). KIT agreed to remit the premiums due to Plaintiffs regardless of whether it collected them from the policy holders. (*Id.*). Further, KIT agreed to hold all premiums in a fiduciary capacity as trustee for the Plaintiffs and to deposit the premiums in premiums trust accounts. (*Id.* § 4.4). The Agency Agreements prohibited KIT from withdrawing sums from these accounts except to pay proper commissions and transfer funds to Plaintiffs, and KIT remained independently responsible for all of its expenses "[u]nless otherwise specifically agreed to in writing." (*Id.* §§ 4.4, 4.6). Plaintiffs retained the right to inspect KIT's books and records to ensure it was complying with its obligations under the Agency Agreements. (*Id.* § 4.8).

2

Defendant PCG provides outsourced operational expertise to insurance agents like KIT. PCG "pushes the paper," issues the policy, collects the money, transmits the collection, etc., so that insurance agents can focus on the marketing aspect. (Campos Dep. 9:16-10:20, Jan. 30, 2008). In the fall of 2005, Defendant begin preliminary discussions with Berkley Insurance Group ("Berkley") and its principal, Charles Spinelli, about acquiring KIT. (Campos Dep.16). At that time, Berkley controlled KIT. (*Id.*). Defendant requested some preliminary due diligence information; Berkley did not respond, and these discussions ultimately died down. (*Id.* 15:25-16:21). Berkley re-engaged Defendant in the spring of 2006. (*Id.* 17:2-3). The parties started the due diligence process and had completed the paperwork necessary for a deal. (*Id.* 17:9-11). Defendants sought to acquire KIT because they believed that it was a solid entity and its problems were largely operational inefficiencies that it could rectify. (*Id.* 17:11-23). Defendant was concerned that KIT's management, Charles Spinelli and Robert Redican, were not located in the same state as KIT. (*Id.* 18:1-9). Defendant wanted to improve KIT operationally. (*Id.*).

Therefore, on April 30, 2006, KIT entered into a Company Management Agreement ("the Management Agreement") with Defendant PCG. (Comp. Ex. 3). Under the Management Agreement, PCG agreed to manage and operate KIT's insurance business as "an independent contractor, not an agent, partner or joint venture of [KIT] except where expressly provided herein." (*Id.* § 2). PCG agreed to be responsible for a specific list of

services and expenses listed in paragraph five of the Management Agreement. Section 5.5.2 of the Management Agreement designates that KIT is to pay Defendant "[m]onthly installment billed on all direct bill policies." (Comp. Ex 3). Paragraph 5.1 states, "No other services or expenses shall be provided by P.C. General Agency in any way except the following . . . ." (*Id.* §§ 5.1.1-5.2.7). The Agency Agreement was not mentioned anywhere in the Management Agreement. PCG did agree to adhere to KIT's "Underwriting Guidelines" and to "use forms and implement procedures that have been approved by KIT." (*Id.* § 3.3). The Management Agreement did not specify what such "procedures" might include.

On May 2, 2006, two days after the parties signed the Management Agreement, Defendant's CEO, Alex Campos, received a phone call from individuals at KIT. (Campos Dep. 21:3-7). He learned that KIT had received a cease and desist order from the state of Washington claiming that their trust was short by more than $700,000. (*Id.*). This incident was not KIT's first experience with the state of Washington's Office of the Insurance Commissioner. In January 2004, KIT had entered into a Stipulation and Consent Order with the State of Washington Insurance Commissioner regarding a shortage in KIT's trust account and allegations that KIT was using trust funds to pay operating expenses. (Campos Dep. Ex. 2). KIT claimed that the current shortage was the result of a system error, but Campos came to believe that KIT had a significant shortage, greater than $700,000, going

4

back several years. (Campos Dep. 22:18-23). Defendant continued to perform under the Management Agreement with KIT.

As 2006 progressed, KIT began to lose insurance carriers, and its business began to dry up. (*Id.* at 40:19 - 41:9). PCG filed bankruptcy on behalf of KIT in October 2006. (Comp. Ex. 4). Defendant contends that it filed for bankruptcy on behalf of KIT because Spinelli "was on the run," "was being sued," "was gonna go to jail," and had "washed his hands of this and kind of said [to Defendant], 'This is your problem,'" and Redican "was gone," "was being interviewed by the FBI in reference to Spinelli's indictment," and "was scared to death." (Campos Dep. 51:7-25). Defendant believed that the court needed an officer of KIT to validate the bankruptcy, so Campos found Spinelli and had him sign an affidavit. (*Id.* 53:23-54:2).

### B. Procedural History

On June 21, 2007, Plaintiffs filed a complaint alleging that (1) Defendant breached the Agency Agreements between Plaintiffs and KIT by failing to pay premium payments to Plaintiffs from April 30, 2006, to October 30, 2007, totaling $159,786 (Comp. ¶¶ 25-30); (2) Defendant breached the fiduciary duty it owed to Plaintiffs when it failed to remit premiums and allowed premium payments to be commingled with KIT's assets (*Id.* ¶¶ 31-35); (3) Defendant tortiously interfered with KIT's fiduciary duty to Plaintiffs in violation of O.C.G.A. 33-23-35 by advising and persuading KIT not to pay premiums and by allowing

5

KIT to commingle funds (*Id.* ¶¶ 36-42); (4) Defendant converted or unlawfully retained the KIT premium payments due Plaintiffs (*Id.* ¶¶ 43-47); and (5) Defendant's actions were willful and wanton and deserving of punitive damages (*Id.* ¶¶ 48-49). Defendant answered Plaintiffs' complaint on August 17, 2007, with general denials and counterclaimed alleging that Plaintiffs violated and breached their duty to refrain from actions damaging third parties by contributing to the shortage in KIT's trust account. Discovery in this matter was scheduled to end March 17, 2008. From the docket, it appears that the parties exchanged interrogatories, requests for production, and requests for admission, but only scheduled limited depositions. The Fed. R. Civ. P. 30(b)(6) deposition of Alex Campos representing Defendant is the only deposition entered on the docket. Defendant filed the instant Motion for Summary Judgment on May 7, 2008 [39], and the instant Motion to Withdraw on July 2, 2008 [48].

## II. Discussion

A court may grant summary judgment "if the pleadings, depositions, answers to interrogatories, and admission on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c). In assessing Defendant's motion, the court views all evidence in the light most favorable to Plaintiffs and will construe all reasonable doubts

6

as to the facts in their favor. *Stewart v. Happy Herman's Cheshire Bridge, Inc.*, 117 F.3d 1278, 1285 (11th Cir. 1997).

### A. Disputed Issues of Fact

In assessing this matter, the court has discovered five disputed issues of fact. First, the parties disagree as to how far PCG went in acquiring KIT. Defendant maintains that "a [PCG] affiliated company discussed the possibility of purchasing KIT and entered into a tentative agreement to purchase KIT, [but] the transaction was never finalized and [PCG's] affiliated company did not purchase KIT." (Campos Aff. ¶¶16-17, May 6, 2008). Plaintiff appears to maintain that the process of "acquir[ing] KIT, shut[ting] it down, and relocat[ing] it to Atlanta" was substantially closer to completion, or had already occurred. (Resp. 10; Campos Dep. 17:9-23; 18:24-19:5). Second, the parties disagree as to how much control Defendant exercised over KIT and how much of KIT's business Defendant was performing. Defendant contends that "KIT and [PCG] have at all times been separate and independent companies," and "[PCG] did not perform and never agreed to perform services for KIT other than as set forth in the [Management Agreement]." (Campos Aff. ¶¶ 6, 21). Plaintiffs maintain that Defendant managed KIT "in its entirety" and had control over aspects of KIT's business not detailed in the Management Agreement including the "collections of monies." (Spinelli Aff.¶ 2, April 16, 2007; Campos Dep. 33:6-7). Third, it is unclear whether Defendant was aware of KIT's obligations to Plaintiffs, including its obligation to hold

7

Plaintiffs' premiums in trust as a fiduciary. Alex Campos indicated that Defendant had no knowledge of the particular requirements of KIT's Agency Agreements with Defendants. (Campos Aff. ¶ 8). Plaintiffs maintain that Defendant obtained knowledge during its due diligence of KIT when it requested "copies of all [KIT's] arrangements with [its] carriers." (Campos Dep. 18:10-12). Fourth, it is unclear whether Defendant ever commingled the premiums it received on behalf of KIT with its own funds. Alex Campos testified in his affidavit that "[PCG] did not co-mingle premiums received on behalf of KIT with [its] accounts"; however, he also testified that "All premiums which [PCG] collected on behalf of KIT were initially deposited into [PCG's] clearing account and then subsequently deposited into KIT's trust account." (Campos Aff. ¶¶ 12, 15). It is unclear what funds were in PCG's clearing account. PCG removed $30,000 from KIT's "operating," not "trust" account as reimbursement of direct operating expenses. (Campos Aff. ¶ 19). It is unclear whether this "operating account" and the "clearing account" were related. Last, it is unclear whether Defendant was able to associate the premiums it received on behalf of KIT to individual insurance carriers, including Plaintiffs. Campos testified in his affidavit, "Premiums received by [PCG] on behalf of KIT came without a correlating policy number and to the best of my knowledge, information, and belief, were paid by KIT to its insurance carriers from KIT's trust account, after deduction of KIT's commissions and fees." (Campos Aff. ¶14). However, he testified in his depositions that Defendant was able to

8

apply a given check to a given policy. (Campos Dep. 34:13-35:2). Having determined that there are at least five disputes of fact, the court must determine whether these disputes are material to Plaintiff's alleged claims.

### B. Breach of Contract

Defendant did not contract with Plaintiffs; therefore, the issue before the court is whether Defendant assumed KIT's obligations under its contract with Plaintiffs. To form a valid contract, all parties must assent to all of the terms. O.C.G.A. § 13-3-2; *Mitchell v. Georgia Dept. of Community Health*, 281 Ga. App. 174, 180 (2006). As such, a contract generally only binds the original parties and those who assume the obligation or ratify or adopt the contract. *Boss v. Bassett Industries of North Carolina, Inc.*, 163 Ga. App. 246 (1982) (denying summary judgment to entity that bought a furniture company and claimed to have no knowledge of company's contract with a designer to pay royalties); *Nursefinders, Inc. v. Suttles*, 213 Ga. App. 608 (denying summary judgment on issue of whether contract was ratified); *Central of Georgia Railway Co. v. Woolfolk Chemical Works, Ltd.*, 122 Ga. App. 789, 791 (1970) (denying summary judgment because corporation failed to prove it had not assumed obligations of prior partnership). A party can assume an obligation expressly in writing, or it "may do so by implication where [its] conduct manifests an intent to become bound." *Central,* 122 Ga. App. at 791. When determining whether a party has assumed an obligation by its conduct, a court must consider all of the circumstances, "such

9

as the subject matter of the contract, the [parties'] acts or words, whether [it] acquiesced to the terms of the contract, performed its obligations, or accepted its benefits." *Id.* A party may also assume the obligations under a contract when it purchases all of the assets, property, good will, etc., of a business and continues to run it as a going concern. *Id.* at 794.

The court finds that Defendant has not met its burden of showing that there is no issue of material fact as to whether it assumed KIT's obligations to Plaintiffs under the Agency Agreements. *Central*, 122 Ga. App. at 795-96 (stating that at summary judgment stage it is defendant's burden to show it did not assume). There are disputed issues of material fact as to whether Defendant essentially acquired KIT and whether Defendant controlled KIT in its entirety. As such, the court will DENY Defendant's Motion for Summary Judgment as to Count I, Breach of Contract.

### C. Breach of Fiduciary Duty

The party alleging the existence of a fiduciary relationship bears the burden of proving its existence. *Premier/Georgia Management Company, Inc. v. Realty Management Corp.*, 272 Ga. App. 780, 787 (2005). Under Georgia law, a fiduciary relationship may arise by law, contract, or the facts of a particular case. *Douglas v. Bigley*, 278 Ga. App. 117, 120 (2006) (finding a possible confidential relationship between a woman and her neighbor in whose company she invested). Under Georgia law, any agent, subagent, or other representative of an insurer receiving or collecting premiums due to the insurer has a

10

fiduciary obligation with respect to those premiums. *Unified Servs. v. Home Ins. Co.*, 218 Ga. App. 85, 87 (1995) (finding that under O.C.G.A. § 33-23-35 an insurance broker had a fiduciary duty to both the insured and the insurer). The facts of a particular case may create a fiduciary relationship "whenever one party is justified in reposing confidence in another, the existence of this relationship is generally a factual matter for the jury to resolve." *Douglas*, 278 Ga. App. at 120. "[M]ost business relationships [however] are not generally confidential or fiduciary relationships." *Newitt v. First Union Nat. Bank*, 270 Ga. App. 538, 546-47(2004).

> Where parties are engaged in a transaction to further their own separate business objectives, there is no duty to represent or advance the other's interests. A fiduciary relationship arises only "where one party is so situated as to exercise a controlling influence over the will, conduct, and interest of another or where, from a similar relationship of mutual confidence, the law requires the utmost good faith, such as the relationship between partners, principal and agent, etc."

*Id.* Georgia courts have found that where an insurer enters into an agreement with an agent to collect and remit premiums, that agent has a fiduciary duty to the insurer regardless of whether the agent must pay all premiums due rather than all premiums collected. *Quaif v. Johnson*, 4 F.3d 950 (11th Cir. 1993); *Koken v. Preferred Underwriting Alliance, Inc.*, No. 2:04-cv-03282, 2007 U.S. Dist. LEXIS 14650 (N.D. Ala. Feb. 7, 2007); *Unified Servs.*, 218 Ga. App. 85.

11

As stated above, it is unclear whether Defendant assumed KIT's obligations to Plaintiffs under the Agency Agreement either because it acquired KIT or managed it in its entirety. As such, the court is unable to determine whether Defendant has a fiduciary duty to Plaintiffs. Even if the court were to assume that Defendant owed Plaintiffs a fiduciary duty, it is unclear whether Defendant breached that duty because there is a material issue of disputed fact as to whether Defendant commingled KIT's premium funds with its operating funds. Defendant's Motion for Summary Judgment is DENIED as to Count II, Breach of Fiduciary Duty.

### D. Tortious Interference with Fiduciary Duty

In order to make out a claim for tortious interference with a fiduciary relationship, a plaintiff must show

> (1) through improper action or wrongful conduct and without privilege, the defendant acted to procure a breach of the primary wrongdoer's fiduciary duty to the plaintiff; (2) with knowledge that the primary wrongdoer owed the plaintiff a fiduciary duty, the defendant acted purposely and with malice and intent to injure; (3) the defendant's wrongful conduct procured a breach of the primary wrongdoer's fiduciary duty; and (4) the defendant's tortious conduct proximately caused damage to the plaintiff.

*Insight Technology, Inc. v. Freightcheck, LLC*, 280 Ga. App. 19, \*26 (2006). Here, there is a dispute of fact as to whether Defendant was aware of KIT's fiduciary duty to Plaintiffs

and, as stated above, whether Defendant ever commingled funds. As such, Defendant's Motion for Summary Judgment as to Count III, tortious interference, is DENIED.

### E. Conversion

In order to make out a claim of conversion, a plaintiff must show that a defendant exercised an unauthorized assumption or right of ownership over personal property belonging to the plaintiff, hostile to plaintiff's rights. *Both v. Frantz*, 278 Ga. App. 556, 557 (2006). Personal property can include money as long as the allegedly converted money is specific and identifiable. *United Services, Inc.*, 218 Ga. App. at 89. Here, there is a disputed material fact as to whether Defendant actually ever commingled funds or moved them to an account hostile to Plaintiffs' right to have them placed in a trust account. Further, there is a disputed issue of material fact as to whether the funds held by Defendant were specific and identifiable by insurer. As such, Defendant's Motion for Summary Judgment as to Count IV, Conversion, is DENIED.

## III. Conclusion

The court finds material issues of disputed fact with respect to Counts I through IV of Plaintiffs' claim and finds that it cannot resolve Count V for punitive damages in light of these disputes. Defendant's Motion for Summary Judgment [39] is DENIED. The court finds that Philip Botwinik has complied with L.R. 83.11, and as such the court GRANTS

13

his uncontested Motion to Withdraw as Attorney [48]. The parties are DIRECTED to file a pretrial order in this matter.

**IT IS SO ORDERED** this 27th day of March 2009.

s/ J. Owen Forrester
J. OWEN FORRESTER
SENIOR UNITED STATES DISTRICT JUDGE

14